## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | |
| ) | **Criminal Action No. 2022-0011** |
| **ROY ALEXANDER MCELROY-CARLOS** ) | |
| **a/k/a ROY ALEXANDER MCELROY-CANOS,** ) | |
| **and JORGE ADALBERTO GUITERREZ-** ) | |
| **PICADO, et al.,** ) | |
| **Defendants.** ) | |
| ) | |

**Attorneys:**
**Daniel H. Huston, Esq.,**
**Adam Francis Sleeper, Esq.,**
St. Croix, U.S.V.I.
  *For the United States*

**Gabriel J. Villegas, Esq.,**
St. Croix, U.S.V.I.
  *For Defendant Roy Alexander McElroy-Canos*

**Jose R. Olmo-Rodriguez, Esq.,**
San Juan, Puerto Rico
  *For Defendant Jorge Adalberto Guiterrez-Picado*

### <u>MEMORANDUM OPINION</u>

**Lewis, District Judge**

THIS MATTER comes before the Court on Defendants Roy Alexander McElroy-Canos'

and Jorge Adalberto Guiterrez-Picado's Motions to Dismiss (Dkt. No. 72 (McElroy-Canos); Dkt.

No. 60 (Guiterrez-Picado)); and the Government's Responses (Dkt. No. 79 (McElroy-Canos); Dkt.

No. 64 (Guiterrez-Picado)). For the reasons that follow, the Court will deny Defendants' Motions

to Dismiss.

## I.    BACKGROUND[1]

Defendants McElroy-Canos and Guiterrez-Picado are Nicaraguan citizens. (Dkt. No. 1-1 at 3). On March 5, 2022, the United States Coast Guard intercepted their vessel, *La Bendecida Leo*, in international waters, 140 nautical miles south-west of Isla de Malpelo, Columbia, in the Pacific Ocean.[2] *Id. La Bendecida Leo* was not flying any flag at the time and not registered to any country, but the three-man crew—including McElroy-Canos, the captain of the vessel; Guiterrez-Picado; and one other Nicaraguan citizen—claimed Nicaraguan nationality for the vessel, which the Nicaraguan government was unable to confirm or deny when the United States inquired through the proper channels. *Id.* A search of *La Bendecida Leo* resulted in the discovery of over 600 kilograms of cocaine and approximately 60 kilograms of marijuana. *Id.* McElroy-Canos, Guiterrez-Picado, and their crewmate were arrested and brought to St. Croix for prosecution, where they were indicted for possession of a controlled substance with intent to distribute while on board a vessel subject to the jurisdiction of the United States, and conspiracy to do the same. (Dkt. No. 80).

McElroy-Canos and Guiterrez-Picado now move to dismiss the Indictment on grounds that the United States lacks jurisdiction over *La Bendecida Leo*, and accordingly, that this Court lacks

---

[1] The Court draws the facts in this section from the Probable Cause Affidavit sworn to by Special Agent Bernhardt Simmonds of the Department of Homeland Security. (*See* Dkt. No. 1-1). Many of these facts are corroborated in the Certification of Commander Ian. M. Starr of the United States Coast Guard (Dkt. No. 72-1), which McElroy-Canos annexed to his Motion.

[2] The Court notes that Guiterrez-Picado represents that *La Bendecida Leo* was intercepted "near Nicaragua" (Dkt. No. 60 at 1), which is inconsistent with the sworn statements of Special Agent Simmonds and Commander Starr, both of whom place the point of interception approximately 330 nautical miles off the west coast of Columbia. (*See* Dkt. No. 1-1 at 3 (representing that the vessel was intercepted 140 nautical miles south-west of Isla de Malpelo); Dkt. No. 72-1 at 1 (representing that the vessel was intercepted at N 3° 22' W 84°)). Ultimately, the exact location of the interception is immaterial, as the parties agree that the Coast Guard intercepted *La Bendecida Leo* in international waters.

subject matter jurisdiction over this action. (Dkt. No. 72 at 1; Dkt. No. 60 at 1-2). Central to

Defendants' Motions to Dismiss is whether a certain provision of the Maritime Drug Law

Enforcement Act, 46 U.S.C. §§ 70501-08 ("MDLEA"), is facially unconstitutional. The provision

at issue is Section 70502(d)(1)(C), which defines a "vessel without nationality," for purposes of

the MDLEA, in such a way as to permit the United States to exercise jurisdiction in the

circumstances that obtain here—namely, where the master of a vessel claims that the vessel is

registered in a given nation, but the claimed nation of registry is unable to "unequivocally" confirm

the vessel's nationality.[3] *Id.* § 70502(d)(1)(C).

For the reasons discussed below, the Court concludes that Defendants have not

demonstrated that Section 70502(d)(1)(C) is facially unconstitutional or that the Indictment in this

case is otherwise infirm. Accordingly, the Court will deny Defendants' Motions to Dismiss.

## II.    DISCUSSION

Guiterrez-Picado moves to dismiss the Indictment solely on the grounds that Section

70502(d)(1)(C) is unconstitutional on its face (Dkt. No. 60 at 3-9), and his Motion to Dismiss

therefore hinges on the success or failure of that singular argument. McElroy-Canos joins in those

grounds (Dkt. No. 72 at 4-9), but also challenges the validity of the Indictment on three additional

bases, each of which rises or falls independently of whether Defendants' shared challenge

succeeds, *id.* at 10-17.

Below, the Court begins with Defendants' shared challenge, finding that Defendants have

not shown that Section 70502(d)(1)(C) is facially unconstitutional. The Court then addresses

McElroy-Canos' three additional arguments, finding each to be without merit.

---

[3] As explained below, McElroy-Canos disputes that the circumstances necessary to trigger the operation of Section 70502(d)(1)(C) were present here. *See infra* pp. 14-16. Guiterrez-Picado does not raise any argument to a similar effect.

**A. Defendants' Shared Challenge**

**1. The Maritime Drug Law Enforcement Act**

Notwithstanding that international law "generally prohibits any country from asserting jurisdiction over foreign vessels on the high seas," *United States v. Marino-Garcia*, 679 F.2d 1373, 1380 (11th Cir. 1982), the high seas is where the United States Coast Guard intercepted *La Bendecida Leo* and arrested Defendants.[4] The Coast Guard's authority to do so—challenged by Defendants here—stems from the MDLEA, which criminalizes certain drug trafficking activity "committed outside the territorial jurisdiction of the United States," 46 U.S.C. § 70503(b), and unilaterally confers the United States with jurisdiction to prosecute such conduct, *id*. § 70502(c). By virtue of its extraterritorial application, the MDLEA is "frequently used to combat drug trafficking across foreign and international water." *United States v. Mendoza*, No. 21-1087, 2022 WL 683638, at *1 (3d Cir. Mar. 8, 2022).

Four provisions give rise to the extraterritorial application of the MDLEA in this case. First, **Section 70503(a)(1)** makes it unlawful for persons "on board a *covered vessel* . . . [to] knowingly or intentionally . . . manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance." 46 U.S.C. § 70503(a)(1) (emphasis added). Second, **Section 70503(e)(1)** defines a "covered vessel" to include any "*vessel subject to the jurisdiction of the United States*." *Id.* § 70503(e)(1) (emphasis added). Third, **Section 70502(c)(1)(A)** defines a "vessel subject to the jurisdiction of the United States" to include any "*vessel without nationality*." *Id.* § 70502(c)(1)(A) (emphasis added). Finally, **Section 70502(d)(1)(C)**—the focus of Defendants' shared challenge—defines a "vessel without nationality" to include "a vessel aboard

---

[4] *See* High Seas, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining the "high seas" as "[t]he ocean waters beyond the jurisdiction of any country," which are often colloquially referred to as international waters).

which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." *Id.* § 70502(d)(1)(C).[5]

As relevant here, the cumulative effect of these provisions is that the MDLEA provides that the United States has jurisdiction to prosecute foreign nationals—like Defendants—who possess a controlled substance with intent to distribute while on board a vessel whose master has claimed nationality where the nation in question has not corroborated the master's claim. *Id.* §§ 70503(a)(1), 70502(d)(1)(C).

### 2. The Parties' Arguments

Defendants' shared challenge to the constitutionality of Section 70502(d)(1)(C) relies on three arguments.

First, Defendants argue that, in defining a "vessel without nationality" to include a vessel whose master has made a claim of registry but whose claimed host nation has not confirmed as much, Section 70502(d)(1)(C) conflicts with international law because it effectively permits the United States to reject a claim of nationality where international law would recognize that claim. (Dkt. No. 72 at 6-9; Dkt. No. 60 at 3-8). Second, Defendants note that Congress relied exclusively

---

[5] In addition, the MDLEA defines a "claim of nationality or registry"—as used in Section 70502(d)(1)(C)—to include "a verbal claim of nationality or registry by the master or individual in charge of the vessel," 46 U.S.C. § 70502(e)(3), and further provides that "[t]he response of a foreign nation to a claim of registry [as contemplated in Section 70502(d)(1)(C)] . . . may be made by radio, telephone, or similar oral or electronic means, and [] proved conclusively by certification of the Secretary of State or the Secretary's designee," *id.* § 70502(d)(2). For purposes of the shared challenge, the parties do not dispute that Section 70502(d)(1)(C) was triggered here: McElroy-Canos, the "master" of *La Bendecida Leo*, claimed Nicaraguan nationality for the vessel (as contemplated in Section 70502(e)(3)), and Commander Starr has certified that the Nicaraguan government did not "affirmatively and unequivocally assert that the vessel is of its nationality" when the United States inquired as to the vessel's nationality through the proper channels (as contemplated in Section 70502(d)(2)). (Dkt. No. 71-1 at 1, 3).

on its authority to "define and punish . . . Felonies committed on the high Seas" under the Felonies

Clause of the Define and Punish Clause of Article I of the United States Constitution, U.S. Const.

art. I, § 8, cl. 10, and argue that Congress does not have the authority under that clause to pass

legislation that conflicts with international law. (Dkt. No. 72 at 4-5; Dkt. No. 60 at 3-4). From

these two arguments, Defendants maintain that it follows that the *La Bendecida Leo* is not subject

to United States jurisdiction and that this Court therefore lacks subject matter jurisdiction over this

action.[6] Finally, Defendants argue that the exercise of jurisdiction here was not otherwise proper.[7]

(Dkt. No. 72 at 9-10, 12-15; Dkt. No. 60 at 8).

In response to Defendants' shared challenge, the Government argues: (1) that Section

70502(d)(1)(C) does not directly conflict with international law; (2) that, even if it did, the

"protective principle" of international law—which "recognizes a state's jurisdiction to prescribe

law with respect to certain conduct outside its territory by persons not its nationals that is directed

against the security of the state or against a limited class of other fundamental state interests,"

---

[6] The Court notes that the parties disagree as to whether the jurisdictional reach of the MDLEA ultimately implicates the Court's subject matter jurisdiction, with McElroy-Canos arguing that Defendants' challenge goes to subject matter jurisdiction and the Government contending that it does not. (Dkt. No. 72 at 3-4; Dkt. No. 79 at 17-20; *see also* Dkt. No. 60 at 3 (Guiterrez-Picado appearing to assume his challenge goes to subject matter jurisdiction)). The Third Circuit has not addressed this issue, and sister circuits are split. *Compare United States v. Prado*, 933 F.3d 121, 132 (2d Cir. 2019) ("Although the MDLEA's term, 'a vessel subject to the jurisdiction of the United States,' has caused confusion, we think it certain for numerous reasons that its function is not to confer subject matter jurisdiction on the federal courts[.]"), *and United States v. Gonzalez*, 311 F.3d 440, 442 (1st Cir. 2002) (same), *with United States v. Nunez*, 1 F.4th 976, 984 (11th Cir. 2021) (observing that the question of whether a vessel is a "covered vessel" for purposes of Section 70503(a)(1) is "the first link in a chain of facts that determines subject-matter jurisdiction"), *and United States v. Miranda*, 780 F.3d 1185, 1192 (D.C. Cir. 2015) (same), and *United States v. Bustos-Useche*, 273 F.3d 622, 626 (5th Cir. 2001) (same). Because the Court finds that Defendants have not shown that Section 70502(d)(1)(C) impermissibly extends the jurisdictional reach of the MDLEA such as to place it in conflict with international law, the Court ultimately does not reach the issue of whether the Court's subject matter jurisdiction is implicated.

[7] McElory-Canos develops this third argument more comprehensively than Guiterrez-Picado. *See infra* note 8.

Restatement (Fourth) of Foreign Relations Law § 412 (2018)—nonetheless permits the United States to exercise jurisdiction here; (3) that Congress's authority under the Define and Punish Clause is not constrained by international law in any event; and (4) that—even if Section 70502(d)(1)(C) is inconsistent with international law and Congress is so constrained—alternative bases for jurisdiction exist here. (Dkt. No. 79 at 4-16).

For the reasons discussed below, the Court concludes that Defendants have not demonstrated that Section 70502(d)(1)(C) conflicts with international law. As Defendants' failure to so demonstrate is fatal to their shared challenge, the Court need not—and does not—reach the parties' arguments as to whether the Define and Punish Clause incorporates international law limitations or whether the protective principle (or some other jurisdictional basis[8]) supplies grounds for Defendants' prosecution.

---

[8] Both McElroy-Canos and the Government address the protective principle and the applicability of other jurisdictional bases at length. In addition to its arguments regarding the protective principle, the Government argues that Section 70502(d)(1)'s definition of a "vessel without nationality"—which includes two alternative definitions in addition to that found in Section 70502(d)(1)(C), neither of which the parties contend is relevant here—"do[es] not exhaust the scope" of the term "vessel without nationality," but rather that the term "also [encompasses] any vessel that is stateless under international law" and that *La Bendecida Leo* so qualifies (Dkt. No. 79 at 3 n.2 (quoting *United States v. Matos-Luchi*, 627 F.3d 1, 4 (1st Cir. 2010) (internal quotation marks omitted))). *See also United States v. Rosero*, 42 F.3d 166, 171 (3d Cir. 1994) (holding that a vessel that is "stateless" under international law is properly deemed to be "without nationality"). In light of the Court's ruling herein, the Court does not reach this argument. Likewise, the Court does not reach McElroy-Canos' arguments to the effect: (1) that the "universal jurisdiction" applicable to crimes of piracy—under which piracy "can be punished by any country no matter where it is committed or by whom"—is not applicable to drug trafficking offenses (Dkt. No. 72 at 9-10); (2) that Congress did not pass MDLEA in order to implement or effectuate any international treaty, and that Congress's treaty power consequently does not extend the jurisdictional reach of the MDLEA, *id.* at 12; and (3) that the protective principle cannot justify the United States' exercise of jurisdiction here, *id.* at 13-15.

7

### 3.    Whether Section 70502(d)(1)(C) Conflicts with International Law

Defendants' shared challenge to the constitutionality of Section 70502(d)(1)(C) relies heavily on the First Circuit's recent decision in *United States v. Dávila-Reyes* ("*Dávila-Reyes II*"), 23 F.4th 153 (1st Cir. 2022), which has been withdrawn pending a ruling by that court sitting *en banc*, 38 F.4th 288 (1st Cir. 2022).[9] In the now withdrawn *Dávila-Reyes II* opinion, the First Circuit held, in relevant part: (1) that "Congress's authority under the Define and Punish Clause, including the Felonies portion of it, [is] constrained by currently applicable international law whenever Congress invokes that Clause to assert its authority over foreign nationals and their vessels on the high seas"; and (2) that Section 70502(d)(1)(C) conflicts with international law because it permits the United States to reject a master's claim of nationality—and thereby exercise jurisdiction over his vessel and crew—where international law would recognize the master's claim.[10] 23 F.4th at 183, 193-94. Given that Defendants do not identify any means in which Section 70502(d)(1)(C) allegedly conflicts with international law other than those identified by the *Dávila-Reyes II* court, that court's reasoning constitutes the essence of Defendant's argument.

In concluding that Section 70502(d)(1)(C) conflicts with international law, the *Dávila-Reyes II* court began by surveying the methods through which international law recognizes that a vessel may assert a claim of nationality in the first instance. *Dávila-Reyes II*, 23 F.4th at 183-86. Such methods include not only flying a flag or possessing proper proof of registration, but also—

---

[9] Sitting *en banc*, the First Circuit heard oral argument in *Dávila-Reyes II* on October 18, 2022, but it has not yet issued a ruling.

[10] From these two holdings, it would follow that Section 70502(d)(1)(C) is unconstitutional because Congress passed the MDLEA while exclusively relying on its authority under the Felonies Clause of the Define and Punish Clause. *See Dávila-Reyes II,* 23 F.4th at 194 ("What the United States cannot do consistently with the Constitution . . . is arrest and prosecute foreigners on foreign vessels by relying on a concept of statelessness that conflicts with international law. And that is what [Section] 70502(d)(1)(C) allows.").

as relevant here—by "mak[ing] an oral claim of nationality when a proper demand is made." *Id.*

at 184 (citation omitted); *see also The Little Charles*, 26 F. Cas. 979, 982 (Marshall, Circuit Justice,

C.C. Va. 1818) ("The vessel acts and speaks by the master."). The MDLEA itself recognizes each

of these three methods—flags, papers, and verbal claims—to be proper methods of asserting

nationality. 46 U.S.C. § 70502(e).

As the *Dávila-Reyes II* court recognized, this conversation—regarding the conditions

under which international law recognizes a claim of nationality—is coextensive with the

conversation regarding the conditions under which international law recognizes a vessel to be

without nationality, *i.e.*, as "stateless." *Dávila-Reyes II*, 23 F.4th at 184. Surveying the state of

international law on this matter, the *Dávila-Reyes II* court determined that international law

recognizes a vessel as stateless in only three scenarios: (1) where no claim of nationality is made;

(2) where conflicting claims of nationality are made; or (3) where the claimed nation of registry

affirmatively disavows such a claim. *Id.* at 184, 187. Note that, by their terms, the circumstances

giving rise to the second and third of these "statelessness conditions" can arise only *after* a

recognized claim of nationality is made in the first instance—in other words, an assertion of

nationality can only be disavowed or conflicted after having been asserted in the first instance.[11]

It follows, then, that an initial assertion of nationality is merely a prima facie showing of the same,

which "can be undermined by contrary evidence, as is the case for any prima facie showing."[12] *Id.*

at 192.

---

[11] A vessel that flies multiple flags at once is arguably an exception to this rule insofar as it makes conflicting claims simultaneously and not sequentially, but the point is irrelevant here. *See Dávila-Reyes II*, 23 F.4th at 192 (noting such circumstances).

[12] *See Dávila-Reyes II*, 23 F.4th at 186 (describing international law as "recogniz[ing] that an oral claim by the vessel's master constitutes prima facie proof of the vessel's nationality"); *The Chiquita*, 19 F.2d 417, 418 (5th Cir. 1927) ("The flag under which a merchant ship sails is prima facie proof of her nationality.").

From here, we reach the crux of the *Dávila-Reyes II* court's argument. By its plain terms, Section 70502(d)(1)(C) does not fit within any of international law's three "statelessness conditions": it permits the United States to override a master's claim of nationality for his vessel where the claimed nation of registry fails to "affirmatively and unequivocally" *avow* that the vessel is of its nationality, rather than requiring the nation to affirmatively *disavow* that the vessel is of its nationality. 46 U.S.C. § 70502(d)(1)(C); *see Dávila-Reyes II*, 23 F.4th at 187 (characterizing Section 70502(d)(1)(C) as "treat[ing] a response [from a claimed host country] that reports only that the named country is unable to confirm nationality—or the country's failure to respond at all to [a] U.S. inquiry—as evidence that is equivalent to an outright denial of a master's claim of nationality or registry"). Further, since the absence of an avowal of nationality is self-evidently a lesser requirement for a finding of statelessness than the presence of a disavowal, Section 70502(d)(1)(C)'s definition of a "vessel without nationality" is broader than the three-part definition of statelessness proscribed by international law. It is in this way, the *Dávila-Reyes II* court reasoned, that Section 70502(d)(1)(C) conflicts with international law: the section, in effect, "displaces the prima facie showing of nationality that [international law recognizes] arises from [a master's] oral assertion of nationality or registry . . . without any affirmative evidence to the contrary," *id.* at 187, thereby permitting the United States to "treat[] as stateless a vessel that, under international law, would be a vessel *with* nationality," *id.* at 197 (emphasis in original).

Here, the Government argues that the *Dávila-Reyes II* court erred in a number of respects, and that applying the decision here would therefore "produce absurd results" insofar as "[a] vessel with no state willing to affirm or deny its nationality would escape the jurisdiction of any state, and illegal activity aboard the vessel could be undertaken with impunity and go unpunished by any state." (Dkt. No. 79 at 11). Regardless of whether applying *Dávila-Reyes II* would lead to the

10

"absurd results" the Government identifies here, the *Dávila-Reyes II* decision is not binding on this Court, nor does this Court find its reasoning persuasive.[13]

As discussed above, international law provides that a vessel's initial showing of nationality—either by flag, papers, or oral assertion—constitutes only a prima facie showing of nationality, which may be overcome by "contrary evidence." *Dávila-Reyes II,* 23 F.4th at 192. As recognized by the *Dávila-Reyes II* court, it follows that an interdicting authority does not violate international law where it refuses to honor a claim of nationality where such contrary evidence is present. *See id.* at 192 ("Importantly, we do not suggest that international law requires the United States to accept a bare assertion of nationality where there is conflicting evidence and attempts to resolve the conflict prove fruitless . . . [W]here surrounding facts provide legitimate reason to doubt an oral claim of nationality, international law would permit the United States to treat the vessel as stateless[.]"); *see also id.* at 192-93 ("International law . . . permits treating a vessel as stateless when its master makes a verbal claim of nationality that is *both* unsubstantiated *and* inconsistent with other relevant indicators of the vessel's nationality." (emphasis in original)).

The requirement that contrary evidence be present before a prima facie assertion of nationality may be overridden is clearly satisfied where a master later makes a conflicting claim of nationality, or where the claimed nation of registry later disavows the master's claim—the second and third "statelessness conditions" identified by the *Dávila-Reyes II* court. *Id.* But a critical ingredient in the court's reasoning in *Dávila-Reyes II* is one that is left largely implicit: defining the contrary evidence required by international law to be limited to only these two

---

[13] The Court notes that *Dávila-Reyes II* has attracted criticism from a number of district courts, and that, "now that the First Circuit has withdrawn *Dávila-Reyes II*, there are no cases, *anywhere in the country*, that take the Defendants' view." *United States v. Rodriguez*, No. 22-CR-20080, 2022 WL 3356632, at *10 (S.D. Fla. Aug. 15, 2022) (emphasis in original); *see also id.* at *10 n.9 (collecting cases).

scenarios, such that anything other than a conflicting claim or affirmative disavowal is insufficient to rebut the master's prima facie claim. According to the *Dávila-Reyes II* court, any and all other contra-indications of nationality—such as where a "vessel's claimed nationality differs from the nationality of most crew members," or where "a small vessel is interdicted far from the claimed country"—only provide an interdicting authority with grounds to "seek [further] verification of the master's claim," not with independent grounds to deem the vessel stateless. *Id.* at 193. In other words, the *Dávila-Reyes* II court determined that contra-indications of nationality (other than a disavowed or narrowly defined or conflicting claim) do not qualify as the "contrary" evidence that international law requires to rebut a prima facie showing of nationality. Instead, such contra-indications—which could include a claimed host nation's failure or inability to "affirmatively and unequivocally" assert the nationality of the vessel in question—only permit an interdicting authority to inquire further to determine whether one of the two "statelessness conditions" identified by the *Dávila-Reyes* II court is present.

Ultimately, the Court does not find support for this proposition in *Dávila-Reyes II*. Put simply, there is nothing in the opinion, or in the authorities upon which it relies, to support the majority's narrow definition of "contrary" evidence as limited only to disavowed or narrowly defined conflicting claims. Framed differently, the *Dávila-Reyes II* court does not provide reason to think that international law does not view a host nation's failure or inability to "affirmatively and unequivocally" assert the nationality of a vessel as "contrary" evidence sufficient to rebut a prima facie claim of nationality.

This defect in the *Dávila-Reyes II* opinion is fatal to Defendant's shared challenge because Defendants do not otherwise attempt to show that Section 70502(d)(1)(C) conflicts with international law. Accordingly, the Court will reject Defendants' shared challenge.

### B. McElroy-Canos' Additional Challenges

In addition to Defendants' shared challenge to Section 70502(d)(1)(C), which the Court has rejected above, McElroy-Canos also challenges the validity of the Indictment on three additional grounds.

**First**, McElroy-Canos argues that prosecutions under chapter 705 of the MDLEA—like his own—violate the Sixth Amendment right to trial by jury insofar as Section 70504(a) of the MDLEA explicitly provides that "[j]urisdictional issues arising under [chapter 705 of the MDLEA] are preliminary questions of law to be determined solely by the trial judge," and that the United States' jurisdiction over a vessel is "not an element of [the underlying] offense," 46 U.S.C. § 70504(a). (Dkt. No. 72 at 12-13). Sister Circuits have held that Section 70504(a)'s assignment of the jurisdictional question to the judge is not constitutionally problematic. *See, e.g., United States v. Vilches-Navarrete*, 523 F.3d 1, 19-23 (1st Cir. 2008) ("We hold that there is no constitutional infirmity in Congress's explicit allocation in § 70504(a) of the question of whether a vessel is "subject to the jurisdiction of the United States" to the court rather than the jury for decision. That allocation was well within the power of Congress."); *United States v. Tinoco*, 304 F.3d 1088, 1111 (11th Cir. 2002) ("[The] jurisdictional requirement is not an essential ingredient or an essential element of the MDLEA substantive offense, and, as a result, it does not have to be submitted to the jury for proof beyond a reasonable doubt."). However, even if Section 70504(a) was constitutionally problematic, the appropriate remedy would be to submit the jurisdictional issue to the jury, not to dismiss the Indictment. The Court therefore finds that McElroy-Canos' Sixth Amendment challenge does not provide grounds for dismissing the Indictment.

**Second**, McElroy-Canos argues that Section 70502(d)'s definition of a "vessel without nationality" violates due process insofar as it criminalizes conduct that—according to McElroy

13

Canos—lacks a sufficient nexus to the United States. *Id.* at 10-11. This argument is squarely

foreclosed by Third Circuit precedent. *See United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056

(3d Cir. 1993) ("[W]e see nothing fundamentally unfair in applying [the MDLEA] exactly as

Congress intended—extraterritorially without regard for a nexus between a defendant's conduct

and the United States."). The Court therefore rejects this argument.[14]

**Third**, McElroy-Canos argues that, even if Section 70502(d)(1)(C) is constitutional, it is

not implicated in this case because McElroy-Canos—in his capacity as the master of *La Bendecida*

*Leo*—made a claim of Nicaraguan *nationality* and not Nicaraguan *registry*. (Dkt. No. 72 at 15-17).

According to McElroy-Canos, Section 70502(d)(1)(C), by its plain language, may provide a valid

basis for jurisdiction only where the master of a vessel makes a claim of *registry*, and therefore

cannot provide a basis for jurisdiction in this case. *Id.; see* 46 U.S.C. § 70502(d)(1)(C) ("[T]he

term "vessel without nationality" includes . . . a vessel aboard which the master or individual in

charge *makes a claim of registry* and for which the claimed nation of registry does not affirmatively

and unequivocally assert that the vessel is of its nationality." (emphasis added)).

McElroy-Canos' argument is drawn from Chief Judge Jeffery R. Howard's concurrence in

*Dávila-Reyes II,* in which Chief Judge Howard embraced precisely this theory, reasoning that

Section 70502 does not treat the terms nationality and registry as synonymous and that claims of

nationality therefore fall outside the intended scope of Section 70502(d)(1)(C). *Dávila-Reyes II,*

---

[14] In *Martinez-Hidalgo,* the Third Circuit acknowledged that MDLEA might give rise to due process concerns "if Congress provided for the extraterritorial application of United States law to conduct on the high seas without regard for a domestic nexus *if that conduct were generally lawful throughout the world*." 993 F.2d at 1057 (emphasis added). That circumstance was not present in *Martinez-Hidalgo*, and McElroy-Canos does not argue—nor could he—that it is present here. *See also id.* at 1057 ("The due process clause does not require that the high seas be turned into a sanctuary highway for drug dealers.").

23 F.4th at 195-96 (Howard, C.J., concurring). The Court is not convinced, finding the reasoning

of the *Dávila-Reyes II* majority—which rejected this argument—more compelling.

As the *Dávila-Reyes II* majority acknowledged, the "the terms 'nationality' and 'registry,'

in formal usage, are not interchangeable": nationality "refers to the country that has certain

'international rights and duties . . . in connection with a given ship and its users," while registration

"refers to the recording of nationality on land and under the supervision of a government body."

*Id.* at 165, 165 n.22 (citation and internal quotation marks omitted). Therefore, inasmuch as a

nation may exclude certain of its vessels from its registry requirement—for example, because of

the size of such vessels—"the former term [registry] is technically narrower than the latter

[nationality]." *Id.* at 166.

At the same time, however, "courts use[] the [two] terms interchangeably," *id.* at 168

(collecting cases), and the MDLEA appears to treat registry and nationality as synonymous in

multiple provisions, including not only Section 70502(e)—the definitional clause for a "claim of

nationality or registry"—but also Section 70502(d)(1)(C) itself, "where the rejection of a master's

claim of *registry* is premised on the named country's failure to confirm *nationality*," *id.* at 166

(emphasis in original). *See also id.* at 165 (observing that Section 70502(e) of the MDLEA appears

to treat the two terms interchangeably). Further, as aptly noted by the *Dávila-Reyes II* majority,

"[e]xcluding claims of nationality from the provision's scope would allow drug traffickers to evade

the verification requirement simply by asserting a claim of nationality," *id.* at 166, and the

legislative history of the MDLEA does not evince that Congress intended to so narrow the scope

of the statute, *see id.* at 167 (reviewing sources).

In light of these considerations, the Court agrees with the *Dávila-Reyes II* majority that "it

[is] evident that Congress's use[] the term 'claim of registry' in the first part of [Section]

70502(d)(1)(C) . . . [is] a common, albeit imprecise, choice of language," which "must be attributable to the not infrequent practice of treating a 'claim of registry' and a 'claim of nationality' as essentially synonymous[.]" *Id.* at 166. In other words, "Congress's reference solely to claims of registry in the first part of [Section] 70502(d)(1)(C) is not reasonably construed to exclude from that subsection's verification requirement claims of nationality that are phrased without reference to registration." *Id.* at 168. The Court therefore rejects McElroy-Canos' argument to the contrary.

## III.    CONCLUSION

For the reasons discussed, the Court rejects Defendants' shared challenge to the constitutionality of Section 70502(d)(1)(C), and further finds McElroy-Canos' additional challenges to the Indictment to be without merit. The Court will therefore deny Defendants' Motions to Dismiss.

An appropriate Order accompanies this Memorandum Opinion.

Date:    July 10, 2023

_____/s/_____
WILMA A. LEWIS
District Judge

16